## PETERSON ET AL. *v.* CITY OF GREENVILLE.

No. 71. Argued November 6–7, 1962.—
Decided May 20, 1963.

Matthew J. Perry argued the cause for petitioners. With him on the brief were *Jack Greenberg, Constance Baker Motley, James M. Nabrit III, Lincoln C. Jenkins, Jr., Willie T. Smith, Leroy Clark, William T. Coleman, Jr., William R. Ming, Jr.* and *Louis H. Pollak.*

*Theodore A. Snyder, Jr.* argued the cause for respondent. With him on the brief was *Thomas A. Wofford.*

*Solicitor General Cox,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Assistant Attorney General Marshall, Ralph S. Spritzer, Louis F. Claiborne, Harold H. Greene, Howard A. Glickstein* and *Richard K. Berg.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The petitioners were convicted in the Recorder's Court of the City of Greenville, South Carolina, for violating the trespass statute of that State.* Each was sentenced to pay a fine of $100 or in lieu thereof to serve 30 days in jail. An appeal to the Greenville County Court was dismissed, and the Supreme Court of South Carolina affirmed. 239 S. C. 298, 122 S. E. 2d 826. We granted certiorari to consider the substantial federal questions presented by the record. 370 U. S. 935.

The 10 petitioners are Negro boys and girls who, on August 9, 1960, entered the S. H. Kress store in Greenville and seated themselves at the lunch counter for the purpose, as they testified, of being served. When the Kress manager observed the petitioners sitting at the counter, he "had one of [his] . . . employees call the Police Department and turn the lights off and state the lunch counter was closed." A captain of police and two other officers responded by proceeding to the store in a patrol car where they were met by other policemen and two state agents who had preceded them there. In the

---

*S. C. Code, 1952 (Cum. Supp. 1960), § 16–388:

"Entering premises after warned not to do so or failing to leave after requested.

"Any person:

"(1) Who without legal cause or good excuse enters into the dwelling house, place of business or on the premises of another person, after having been warned, within six months preceding, not to do so or

"(2) Who, having entered into the dwelling house, place of business or on the premises of another person without having been warned within six months not to do so, and fails and refuses, without good cause or excuse, to leave immediately upon being ordered or requested to do so by the person in possession, or his agent or representative,

"Shall, on conviction, be fined not more than one hundred dollars, or be imprisoned for not more than thirty days."

presence of the police and the state agents, the manager "announced that the lunch counter was being closed and would everyone leave" the area. The petitioners, who had been sitting at the counter for five minutes, remained seated and were promptly arrested. The boys were searched, and both boys and girls were taken to police headquarters.

The manager of the store did not request the police to arrest petitioners; he asked them to leave because integrated service was "contrary to local customs" of segregation at lunch counters and in violation of the following Greenville City ordinance requiring separation of the races in restaurants:

"It shall be unlawful for any person owning, managing or controlling any hotel, restaurant, cafe, eating house, boarding-house or similar establishment to furnish meals to white persons and colored persons in the same room, or at the same table, or at the same counter; provided, however, that meals may be served to white persons and colored persons in the same room where separate facilities are furnished. Separate facilities shall be interpreted to mean:

"(a) Separate eating utensils and separate dishes for the serving of food, all of which shall be distinctly marked by some appropriate color scheme or otherwise;

"(b) Separate tables, counters or booths;

"(c) A distance of at least thirty-five feet shall be maintained between the area where white and colored persons are served;

"(d) The area referred to in subsection (c) above shall not be vacant but shall be occupied by the usual display counters and merchandise found in a business concern of a similar nature;

"(e) A separate facility shall be maintained and used for the cleaning of eating utensils and dishes furnished the two races." Code of Greenville, 1953, as amended in 1958, § 31–8.

The manager and the police conceded that the petitioners were clean, well dressed, unoffensive in conduct, and that they sat quietly at the counter which was designed to accommodate 59 persons. The manager described his establishment as a national chain store of 15 or 20 departments, selling over 10,000 items. He stated that the general public was invited to do business at the store and that the patronage of Negroes was solicited in all departments of the store other than the lunch counter.

Petitioners maintain that South Carolina has denied them rights of free speech, both because their activity was protected by the First and Fourteenth Amendments and because the trespass statute did not require a showing that the Kress manager gave them notice of his authority when he asked them to leave. Petitioners also assert that they have been deprived of the equal protection of the laws secured to them against state action by the Fourteenth Amendment. We need decide only the last of the questions thus raised.

The evidence in this case establishes beyond doubt that the Kress management's decision to exclude petitioners from the lunch counter was made because they were Negroes. It cannot be disputed that under our decisions "private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it." *Burton v. Wilmington Parking Authority,* 365 U. S. 715, 722; *Turner v. City of Memphis,* 369 U. S. 350.

It cannot be denied that here the City of Greenville, an agency of the State, has provided by its ordinance that the decision as to whether a restaurant facility is to be

operated on a desegregated basis is to be reserved to it. When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby "to a significant extent" has "become involved" in it, and, in fact, has removed that decision from the sphere of private choice. It has thus effectively determined that a person owning, managing or controlling an eating place is left with no choice of his own but must segregate his white and Negro patrons. The Kress management, in deciding to exclude Negroes, did precisely what the city law required.

Consequently these convictions cannot stand, even assuming, as respondent contends, that the manager would have acted as he did independently of the existence of the ordinance. The State will not be heard to make this contention in support of the convictions. For the convictions had the effect, which the State cannot deny, of enforcing the ordinance passed by the City of Greenville, the agency of the State. When a state agency passes a law compelling persons to discriminate against other persons because of race, and the State's criminal processes are employed in a way which enforces the discrimination mandated by that law, such a palpable violation of the Fourteenth Amendment cannot be saved by attempting to separate the mental urges of the discriminators.

*Reversed.*

MR. JUSTICE HARLAN, concurring in the result in No. 71, and dissenting in whole or in part in Nos. 58, 66, 11, and 67.*

These five racial discrimination cases, and No. 68, *Wright* v. *Georgia* (*post*, p. 284) in which I join the opin-

*[No. 58 is *Lombard et al.* v. *Louisiana*, *post*, p. 267; No. 66 is *Gober et al.* v. *City of Birmingham*, *post*, p. 374; No. 11 is *Avent et al.* v. *North Carolina*, *post*, p. 375, and No. 67 is *Shuttlesworth et al.* v. *City of Birmingham*, *post*, p. 262.]

ion of the Court, were argued together. Four of them arise out of "sit-in" demonstrations in the South and involve convictions of Negro students [1] for violations of criminal trespass laws, or similar statutes, in South Carolina (*Peterson, ante,* p. 244), Louisiana (*Lombard, post,* p. 267), Alabama (*Gober, post,* p. 374), and North Carolina (*Avent, post,* p. 375) respectively. Each of these convictions rests on state court findings, which in my opinion are supported by evidence, that the several petitioners had refused to move from "white" lunch counters situated on the premises of privately owned department stores after having been duly requested to do so by the management. The other case involves the conviction of two Negro ministers for inciting, aiding, or abetting criminal trespasses in Alabama (*Shuttlesworth, post,* p. 262).

In deciding these cases the Court does not question the long-established rule that the Fourteenth Amendment reaches only state action. *Civil Rights Cases,* 109 U. S. 3. And it does not suggest that such action, denying equal protection, may be found in the mere enforcement of trespass laws in relation to private business establishments from which the management, of its own free will, has chosen to exclude persons of the Negro race.[2] Judicial enforcement is of course state action, but this is not the end of the inquiry. The ultimate substantive question is whether there has been "State action of a particular character" (*Civil Rights Cases, supra,* at 11)—whether the character of the State's involvement in an arbitrary discrimination is such that it should be held *responsible* for the discrimination.

---

[1] Except for one white student who participated in a demonstration. *Lombard, post,* p. 267.

[2] It is not nor could it well be suggested that general admission of Negroes to the stores prevented the management from excluding them from service at the white lunch counters.

This limitation on the scope of the prohibitions of the Fourteenth Amendment serves several vital functions in our system. Underlying the cases involving an alleged denial of equal protection by ostensibly private action is a clash of competing constitutional claims of a high order: liberty and equality. Freedom of the individual to choose his associates or his neighbors, to use and dispose of his property as he sees fit, to be irrational, arbitrary, capricious, even unjust in his personal relations are things all entitled to a large measure of protection from governmental interference. This liberty would be overridden, in the name of equality, if the strictures of the Amendment were applied to governmental and private action without distinction. Also inherent in the concept of state action are values of federalism, a recognition that there are areas of private rights upon which federal power should not lay a heavy hand and which should properly be left to the more precise instruments of local authority.

My differences with the Court relate primarily to its treatment of the state action issue and to the broad strides with which it has proceeded in setting aside the convictions in all of these cases. In my opinion the cases call for discrete treatment and results.

## I.

### THE PETERSON CASE (No. 71).

In this case, involving the S. H. Kress store in Greenville, South Carolina, the Court finds state action in violation of the Fourteenth Amendment in the circumstance that Greenville still has on its books an ordinance (*ante,* p. 246) requiring segregated facilities for colored and white persons in public eating places. It holds that the *mere existence* of the ordinance rendered the State's enforcement of its trespass laws unconstitutional, quite irrespective of whether the Kress decision to exclude these petitioners from the white lunch counter was actually

influenced by the ordinance. The rationale is that the. State, having compelled restaurateurs to segregate their establishments through this city ordinance, cannot be heard to say, in enforcing its trespass statute, that Kress' decision to segregate was in fact but the product of its own untrammeled choice. This is said to follow because the ordinance removes the operation of segregated or desegregated eating facilities "from the sphere of private choice" and because "the State's criminal processes are employed in a way which enforces" the ordinance. *Ante,* p. 248.

This is an alluring but, in my view, a fallacious proposition. Clearly Kress might have preferred for reasons entirely of its own not to serve meals to Negroes along with whites, and the dispositive question on the issue of state action thus becomes whether such was the case, or whether the ordinance played some part in the Kress decision to segregate. That is a question of fact.

Preliminarily, I do not understand the Court to suggest that the ordinance's removal of the right to operate a segregated restaurant "from the sphere of private choice" renders the private restaurant owner the agent of the State, such that his operation of a segregated facility *ipso facto* becomes the act of the State. Such a theory might well carry the consequence that a private person so operating his restaurant would be subject to a Civil Rights Act suit on the part of an excluded Negro for unconstitutional action taken under color of state law (cf. *Monroe* v. *Pape,* 365 U. S. 167)—an incongruous result which I would be loath to infer that the Court intends. Kress is of course a purely private enterprise. It is in no sense "the repository of state power," *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278, 286, and this segregation ordinance no more makes Kress the agent or delegate of the State than would any other prohibitory measure affecting the conduct of its business. The Court does not intimate anything to the contrary.

The majority's approach to the state action issue is in my opinion quite untenable. Although the right of a private restaurateur to operate, if he pleases, on a segregated basis is ostensibly left untouched, the Court in truth effectually deprives him of that right in any State where a law like this Greenville ordinance continues to exist. For a choice that can be enforced only by resort to "self-help" has certainly become a greatly diluted right, if it has not indeed been totally destroyed.

An individual's right to restrict the use of his property, however unregenerate a particular exercise of that right may be thought, lies beyond the reach of the Fourteenth Amendment. The dilution or virtual elimination of that right cannot well be justified either on the premise that it will hasten formal repeal of outworn segregation laws or on the ground that it will facilitate proof of state action in cases of this kind. Those laws have already found their just constitutional deserts in the decisions of this Court, and in many communities in which racial discrimination is no longer a universal or widespread practice such laws may have a purely formal existence and may indeed be totally unknown. Of course this is not to say that their existence on the books may never play a significant and even decisive role in private decision making. But the question in each case, if the right of the individual to make his own decisions is to remain viable, must be: was the discriminatory exclusion in fact influenced by the law? Cf. *Truax* v. *Raich,* 239 U. S. 33.[3] The inexorable rule

---

[3] In *Truax* the Court, in finding state action in violation of the Fourteenth Amendment, relied on the evidence showing that an alien employee had been discharged by his employer solely because of the latter's fear of criminal penalties for noncompliance with a state statute prohibiting the employment of more than a certain number of aliens. The Court stressed the importance of "the freedom of the employer to exercise his judgment without illegal interference or compulsion . . . ." *Id.,* at 38. (Emphasis added.)

which the Court lays down reflects insufficient reckoning with the course of history.

It is suggested that requiring proof of the effect of such laws in individual instances would involve "attempting to separate the mental urges of the discriminators" (*ante,* p. 248). But proof of state of mind is not a novel concept in the law of evidence, see 2 Wigmore, Evidence (3d ed. 1940), §§ 385–393, and such a requirement presents no special barriers in this situation. The mere showing of such an ordinance would, in my judgment, make out a *prima facie* case of invalid state action, casting on the State the burden of proving that the exclusion was in fact the product solely of private choice. In circumstances like these that burden is indeed a heavy one. This is the rule which, in my opinion, evenhanded constitutional doctrine and recognized evidentiary rules dictate. Its application here calls for reversal of these convictions.

At the trial existence of the Greenville segregation ordinance was shown and the city adduced no rebutting evidence indicating that the Kress manager's decision to exclude these petitioners from the white lunch counter was wholly the product of private choice. All doubt on that score is indeed removed by the store manager's own testimony. Asked for the reasons for his action, he said: "It's contrary to local customs *and* its [*sic*] also the ordinance that has been discussed" (quite evidently referring to the segregation ordinance). (Emphasis added.) This suffices to establish state action, and leads me to join in the judgment of the Court.

## II.

### THE LOMBARD CASE (No. 58).

In this case, involving "sit-ins" at the McCrory store in New Orleans, Louisiana, the Court carries its state

action rule a step further. Neither Louisiana nor New Orleans has any statute or ordinance requiring segregated eating facilities. In this instance state action is found in the public announcements of the Superintendent of Police and the Mayor of New Orleans, set forth in the Court's opinion (*post,* p. 267), which were issued shortly after "sit-in" demonstrations had first begun in the city. Treating these announcements as the equivalent of a city ordinance, the Court holds that they served to make the State's employment of its "trespass" statute against these petitioners unconstitutional, again without regard to whether or not their exclusion by McCrory was in fact influenced in any way by these announcements.

In addition to what has already been said in criticism of the *Peterson* ruling, there are two further factors that make the Court's theory even more untenable in this case.

1. The announcements of the Police Superintendent and the Mayor cannot well be compared with a city ordinance commanding segregated eating facilities. Neither announcement was addressed to restaurateurs in particular, but to the citizenry generally. They did not press private proprietors to segregate eating facilities; rather they in effect simply urged Negroes and whites not to insist on nonsegregated service in places where segregated service obtained. In short, so far as this record shows, had the McCrory store chosen to serve these petitioners along with whites it could have done so free of any sanctions or official constraint.

2. The Court seems to take the two announcements as an attempt on the part of the Police Superintendent and the Mayor to perpetuate segregation in New Orleans. I think they are more properly read as an effort by these two officials to preserve the peace in what they might reasonably have regarded as a highly charged atmosphere. That seems to me the fair tenor of their exhortations.

If there were nothing more to this case, I would vote to affirm these convictions for want of a sufficient showing of state action denying equal protection. There is, however, some evidence in the record which might indicate advance collaboration between the police and McCrory with respect to these episodes. The trial judge refused to permit defense counsel to pursue inquiry along this line, although counsel had made it perfectly clear that his purpose was to establish official participation in the exclusion of his clients by the McCrory store. I think the shutting off of this line of inquiry was prejudicial error.

For this reason I would vacate the judgment of the state court and remand the case for a new trial so that the issue of state action may be properly explored.

## III.

### THE GOBER CASE (No. 66).

This case concerns "sit-ins" at five different department stores in Birmingham, Alabama. Birmingham has an ordinance requiring segregated facilities in public eating places.[4]

It is first necessary to consider whether this ordinance is properly before us, a question not dealt with in this Court's *per curiam* reversal. The Alabama Court of Appeals refused to consider the effect of the ordinance on petitioners' claim of denial of equal protection, stating

---

[4] General City Code of Birmingham (1944), § 369: "It shall be unlawful to conduct a restaurant or other place for the serving of food in the city, at which white and colored people are served in the same room, unless such white and colored persons are effectually separated by a solid partition extending from the floor upward to a distance of seven feet or higher, and unless a separate entrance from the street is provided for each compartment."

that "there is no question presented in the record before us, by the pleading, of any statute or ordinance requiring the separation of the races in restaurants. The prosecution was for a criminal trespass on private property." 41 Ala. App., at 317, 133 So. 2d, at 701.

This, on the one hand, could be taken to mean that the Birmingham ordinance was not properly before the Court of Appeals because it had not been specially pleaded as a defense. We would then be faced with the necessity of deciding whether such a state ground is adequate to preclude our consideration of the significance of the ordinance. In support of the view that such a ground exists respondent refers us to Alabama Code (1958), Tit. 7, § 225, requiring matters of defense to be pleaded specially in a civil case,[5] and to the statement of the Court of Appeals that "[t]his being an appeal from a conviction for violating a city ordinance, it is quasi criminal in nature, and subject to rules governing civil appeals," 41 Ala. App., at 315, 133 So. 2d, at 699.

On the other hand, in view of the last sentence in the Court of Appeals' statement—"The prosecution was for a criminal trespass on private property"—it may be that the court simply shared the apparent misapprehension of the trial judge as to the materiality of the segregation ordinance in a prosecution laid only under the trespass statute.[6] This view of the matter is lent some color by the circumstance that, although Alabama Code (1958), Tit. 7, § 429 (1), rendered the ordinance judicially noticeable, the Court of Appeals' opinion does not address itself at all to the question whether the ordinance, bearing as it did on the vital issue of state action in this trespass prose-

---

[5] "The defendant may plead more pleas than one without unnecessary repetition; and, if he does not rely solely on a denial of the plaintiff's cause of action, must plead specially the matter of defense."

[6] See the printed record in this Court, pp. 24–26.

cution, was in truth a "matter of defense" within the meaning of § 225.[7]

In this muddy posture of things it is impossible to say whether or not these judgments are supportable on an adequate and independent state ground. Because of this, and in light of the views I have expressed in the *Peterson* case (*supra*, pp. 250–253), two things are called for. *First*, the parties should be afforded an opportunity to obtain from the Alabama Court of Appeals a clarification of its procedural holding respecting the Birmingham segregation ordinance. If the Court of Appeals holds that it is procedurally foreclosed from considering the ordinance, the adequacy of such a state ground would then of course be a question for this Court. *Second*, if the Court of Appeals holds that it is not foreclosed from considering the ordinance, there should then be a new trial so that the bearing of the ordinance on the issue of state action may be fully explored. To these ends I would vacate the judgments below and remand the case to the Alabama Court of Appeals.

## IV.

### THE AVENT CASE (No. 11).

In this case it turns out that the City of Durham, North Carolina, where these "sit-ins" took place, also had a restaurant segregation ordinance.[8] In affirming

---

[7] In this connection it is not at all clear that the state rules relating to civil actions apply to *all* phases of this prosecution. The Court of Appeals referred only to their application to *appeals* in this type of case, and it may be that the special pleading rule of § 225 does not apply in a trespass prosecution. The Alabama cases cited by the Court of Appeals, see 41 Ala. App., at 315, 316, 133 So. 2d, at 699, shed no light on this question, and respondent has not referred to any other relevant authority.

[8] Code of Durham (1947), c. 13, § 42: "In all licensed restaurants, public eating places and 'weenie shops' where persons of the white

these convictions the North Carolina Supreme Court evidently proceeded, however, on the erroneous assumption that no such ordinance existed. 253 N. C. 580, 118 S. E. 2d 47.

In these circumstances I agree with the Court that the case should be returned to the State Supreme Court for further consideration. See *Patterson* v. *Alabama,* 294 U. S. 600. But disagreeing as I do with the premises on which the case will go back under the majority's opinion in *Peterson,* I must to that extent dissent from the opinion and judgment of the Court.

## V.

### THE SHUTTLESWORTH CASE (No. 67).

This last of these cases concerns the Alabama convictions of two Negro clergymen, Shuttlesworth and Billups, for inciting, aiding, or abetting alleged violations of the criminal trespass ordinance of the City of Birmingham.

On the premise that these two petitioners were charged with inciting, aiding, or abetting only the "sit-ins" involved in the *Gober* case (*post,* p. 374), the Court, relying on the unassailable proposition that "there can be no conviction for aiding and abetting someone to do an innocent act" (*post,* p. 265), holds that these convictions must fall in consequence of its reversal of those in the *Gober* case. The difficulty with this holding is that it is based on an erroneous premise. Shuttlesworth and Billups were not charged *merely* with inciting the *Gober*

---

and colored races are permitted to be served with, and eat food, and are allowed to congregate, there shall be provided separate rooms for the separate accommodation of each race. The partition between such rooms shall be constructed of wood, plaster or brick or like material, and shall reach from floor to the ceiling. Any person violating this section shall, upon conviction, pay a fine of ten dollars and each day's violation thereof shall constitute a separate and distinct offense."

"sit-ins" but *generally* with inciting violations of the Birmingham trespass ordinance. And I do not think it can be said that the record lacks evidence of incitement of "sit-ins" other than those involved in *Gober*.[9] Hence the Court's reversal in *Gober* cannot well serve as the ground for reversal here.

There are, however, other reasons why, in my opinion, these convictions cannot stand. As to Billups, the record shows that he brought one of the students to Shuttlesworth's home and remained there while Shuttlesworth talked. But there is nothing to indicate Billups' purpose in bringing the student, what he said to him, or even whether he approved or disapproved of what Shuttlesworth urged the students to do. A conviction so lacking in evidence to support the offense charged must fall under the Fourteenth Amendment. *Thompson* v. *Louisville*, 362 U. S. 199.

On this score the situation is different with respect to Shuttlesworth. Given (1) the then current prevalence of

---

[9] At the trial testimony was introduced showing that Gober and Davis (two of the 10 defendants in the *Gober* case), as well as "other persons" who "were present . . . in the Court room" when the defendants in the *Gober* case were tried for trespass, attended the meeting at Shuttlesworth's house. There was also testimony that "other boys who attended the meeting" participated in "sit-ins" in Birmingham on the same day that the *Gober* "sit-ins" occurred. The record does not reveal whether the *Gober* defendants were the *only* persons who participated in the "sit-ins," nor whether there were others who were incited by Shuttlesworth but who did not thereafter take part in "sit-in" demonstrations. The trial court's statement that "you have here the ten students and the Court thinks they were misused and misled into a violation of a City Ordinance" was made in the course of sentencing the *Gober* defendants, not Shuttlesworth or Billups (the trials of both of these groups of defendants having been conducted *seriatim* by the same judge, who reserved sentencing until all trials had been completed). It was in no sense a finding of fact with respect to the crimes with which Shuttlesworth and Billups had been charged.

"sit-in" demonstrations throughout the South,[10] (2) the commonly understood use of the phrase "sit-in" or "sit-down" to designate a form of protest which typically resulted in arrest and conviction for criminal trespass or other similar offense, and (3) the evidence as to Shuttlesworth's calling for "sit-down" volunteers and his statement that he would get any who volunteered "out of jail," I cannot say that it was constitutionally impermissible for the State to find that Shuttlesworth had urged the volunteers to demonstrate on privately owned premises despite any objections by their owners, and thus to engage in criminal trespass.

Nevertheless this does not end the matter. The trespasses which Shuttlesworth was convicted of inciting may or may not have involved denials of equal protection, depending on the event of the "state action" issue. Certainly one may not be convicted for inciting conduct which is not itself constitutionally punishable. And dealing as we are in the realm of expression, I do not think a State may punish incitement of activity in circumstances where there is a substantial likelihood that such activity may be constitutionally protected. Cf. *Garner* v. *Louisiana,* 368 U. S. 157, 196–207 (concurring opinion of this writer). To ignore that factor would unduly inhibit freedom of expression, even though criminal liability for incitement does not ordinarily depend upon the event of the conduct incited.[11]

---

[10] See Pollitt, Dime Store Demonstrations: Events and Legal Problems of First Sixty Days, Duke L. J. (1960) 315, 317–337. Apparently the state courts took judicial notice of such demonstrations in Alabama, which they evidently had the right to do. See, *e. g., Green* v. *Mutual Benefit Health & Accident Assn.,* 267 Ala. 56, 99 So. 2d 694.

[11] See Wechsler, Jones and Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy, 61 Col. L. Rev. 571, 621–628 (1961).

Were I able to agree with the Court that the existence of the Birmingham segregation ordinance without more rendered all incited trespasses in Birmingham immune from prosecution, I think outright reversal of Shuttlesworth's conviction would be called for. But because of my different views as to the significance of such ordinances (*supra,* pp. 251–253), I believe that the bearing of this Birmingham ordinance on the issue of "substantiality" in Shuttlesworth's case, no less than its bearing on "state action" in the *Gober* case, involves questions of fact which must first be determined by the state courts. I would therefore vacate the judgment as to Shuttlesworth and remand his case for a new trial.

These then are the results in these cases which in my view sound legal principles require.