The UNITED STATES of America ex rel.

v.

T. Ralph GRIMES, Sheriff of Fulton
County, Georgia.

Civ. A. No. 8895.

United States District Court
N. D. Georgia,
Atlanta Division.

May 8, 1964.

Donald L. Hollowell and Howard Moore, Jr., Atlanta, Ga., for petitioner.

J. Robert Sparks, Asst. Sol. Gen., Atlanta, Ga., for respondent.

HOOPER, Chief Judge.

This application for the writ of habeas corpus filed April 22, 1964 seeks to obtain the release of Tom Taylor Tolg now being held by respondent under authority of the sentence imposed upon petitioner for violation of Title 26 of the Georgia Code, § 3005 (Georgia Laws 1960, p. 142). The sentence was for a period of eighteen (18) months and One Thousand ($1,000.00) Dollars fine, with a provision that it would be suspended after four (4) months if petitioner herein would agree in writing to desist in the future from a violation of the laws of Georgia and other states.[1]

Petitioner contends that the Georgia statute in question is unconstitutional. He further contends that said statute even if constitutional was used to protect and sanction racial discrimination in a certain restaurant in the City of Atlanta operated at the time by one Charles Lebedin, prosecutor in the State Court.

*Plea in Abatement in the State Court.*

Petitioner herein prior to his arraignment in the State Court filed a Plea in Abatement, setting up the aforesaid alleged application of the Georgia statute claiming defendant's rights to equal protection of the laws were violated in that the Police Department of the City of Atlanta allegedly arrested petitioner in a place of public accommodation, same constituting State action in violation of the Fourteenth Amendment to the United States Constitution.

This Court admitted in evidence by consent of all parties the transcript of the hearing of said Plea in Abatement in the State court with some doubt in the mind of this Court as to its legal effect as to controverted issues of fact and as to the effect of the finding of the State court overruling the same.

After a careful study of said transcript, however, this Court is of the opinion that there was sufficient sworn testimony not in dispute upon which this Court can make its Findings.[2]

In situations such as this it would seem to be important to ascertain whether petitioner, together with two white companions and eleven Negro companions, did on June 17, 1963 peaceably enter "Leb's" restaurant, request to be served, were asked to leave and declined to leave, and were thereupon arrested under the Georgia statute, or whether on the other hand they committed other acts which would justify Mr. Lebedin's calling of the police for the protection of his property rights. While a discussion

---

1. In the colloquy between the court and petitioner at the time of sentence (see plaintiff's exhibit 11) the trial judge stated: "The sentence of the Court is that you serve twelve months on the public works, six months in the common jail and pay a fine of a thousand dollars, provided however, that after you have served four months on the public works if you will state in writing that it is your purpose to comply with the laws of this State and other states wherein you reside, the remainder of the sentence will stand suspended conditioned upon your compliance with the laws of this State when you are in this State and the laws of other states when you are in other states. So, after serving four months, if you are willing to present a statement to that effect, the remainder of the sentence would be suspended."

2. There was quite a bit of rather extravagant testimony adduced by each side, both as to the alleged conduct of petitioner and his thirteen companions, and also upon the part of Lebedin, the restaurant operator, and his employees. Counsel for neither side in this case offered to produce any witnesses to resolve these conflicts and the Court did not insist upon their production.

of the legal distinction between these points will be given hereinafter, the testimony herein referred to furnishes a basis for the application of the principles of law involved in this controversy.

### Circumstances Surrounding Petitioner's Arrest.

Testimony adduced upon the hearing of the Plea in Abatement discloses the following circumstances surrounding the arrest of the petitioner:

Petitioner was a twenty-three years old white student of sociology, studying for his master's degree, in the University of Miami in Ohio, also a teacher of sociology. He had come to Atlanta pursuant to his employment by "The Students Non-Violent Cooperation Committee" to assist that organization in its efforts to eliminate the private practice of racial segregation upon the part of privately owned public accommodations in Atlanta, with particular emphasis on restaurants.

On the morning of June 17th petitioner, together with two other young white students and eleven Negro students, met (by previous appointment, or otherwise) at a Negro church near Atlanta University (a Negro college) and together walked several miles to "Leb's" restaurant at the corner of Forsyth and Luckie Streets in the downtown business area. Some of this group had been there on previous occasions. There had been numerous occasions where this group, or similar groups, had picketed "Leb's" restaurant on account of its policy of segregation, causing a number of spectators to congregate about the same. On the day in question as this group approached the main entrance to the restaurant (this entrance consisting of a foyer of triangular shape at the intersection) Mr. Lebedin and some of his employees closed the door to prevent their entering and it is reasonable to suppose that his motives were partly on account of unwillingness to serve Negroes, and also his past experiences of disorder and unrest by virtue of the presence of such groups of demonstrators.

Charles Lebedin, sworn as an adverse party, testified in part as follows: On the day in question witness was inside his restaurant and he "saw a gang rushing the door, and we went up to stop them and they sat right down on my property," they tried to come in and we would not let them (Tr. 19). "There were some strangers out there, customers that saw what was going on and they jumped right into it * * * the street was crowded with two or three hundred people" (Tr. 20) * * * "it was like a mob" (Tr. 21). * * * He had had these demonstrations for five months (Tr. 26). About ninety-five per cent of his customers entered through the door in question (Tr. 34). The demonstrators "were sitting on the sidewalk and laying there, naturally they were objectionable" (Tr. 42). * * * "They were all in a bunch, they all had their arms locked together, they were sitting down and they all had their arms locked together" (Tr. 44). He asked them to leave but they refused. He called a policeman and the policeman before making arrests insisted that Mr. Lebedin again ask them to move, and they refused.

There seems to be no doubt that these demonstrators were blocking the entrance to "Leb's" restaurant so that customers could neither come in nor get out. They were sitting or lying in the vestibule just outside the door and were on the property of Mr. Lebedin (that is, the corporation in which he owns stock).

Petitioner Tolg was sitting in this vestibule and "the police had a hard time getting him up to put in the wagon" (Tr. 46). "Leb's" business reached a peak between 12:00 and 2:00 o'clock and that's the time the demonstrators were there. "They were obstructing the place, when you would try to get out and open our doors you couldn't" * * * people came in and joined strangers and there was really a rumpus going on, people could not get in and out of my restaurant at my peak period" (Tr. 52).

This demonstration apparently interfered seriously with other customers of "Leb's" restaurant. Two lady customers

were in the restaurant, had to be back at their place of business by two o'clock, but were unable to leave. "Leb's" employees "tried to make a path * * * to try to get these women out" (Tr. 55). Certain strangers who were there tried to assist in this effort, they "stepped over these people * * * they formed a line and they said, now ladies come on out. I went outside and took the ladies out and walked them through". The ladies "were pleading, please get us out we have got to get to work" (Tr. 56).

The congestion at the door was further proven by testimony of Michael Sayer, a young Negro student who accompanied petitioner to "Leb's" restaurant who testified "I stood there unable to enter and unable to leave because there were people behind me also trying to enter the restaurant. Someone in the restaurant wanted to leave the restaurant so the left hand door * * * was opened * * to allow this person to leave" (Tr. 75).

The above-named witness, Michael Sayer, was born in Brooklyn, New York, was a student in Atlanta University summer school in 1961 and graduated from Harvard University in 1962. At the time in question he was employed by the Students Non-Violent Cooperation Committee with headquarters in Atlanta, he met with the others at Rush Memorial Church and the group walked three miles to "Leb's" restaurant, but denied they met there for the purpose of "coming up there and crashing 'Leb's' restaurant" (Tr. 94). He explained their sitting down before the door by stating "I sat down to protect myself after being shoved and pulled" (Tr. 96). He admitted, however, that he did sit down and the group that was with him also sat down (Tr. 97). He attempted to explain his failure to move by his alleged physical condition, with the following colloquy:

Q. "Answer my question. Was your physical condition such that you could not walk?"

A. "I am not a doctor and there is no categorial answer to the question. You are asking me to make a conclusion about my own

condition. I think perhaps I might not have been able to" (Tr. 99).

Another demonstrator was Thomas Rachel, a Negro student at Morehouse College, eighteen years of age. He stated that when he arrived at the restaurant "one of the young men in a blue suit, he had blond hair, began to beat us" (Tr. 104), and he said "well, when the man came over and started beating us we sat down to protect ourselves" (Tr. 107).

While Mr. Lebedin would not expressly admit it, it appears clear from his testimony that it was his policy to exclude Negroes as customers of his restaurant. It was not shown that there was any statute of Georgia, or any ordinance of the City of Atlanta, or any custom or practice upon the part of either, as to such discrimination. While there were a number of charges of violence and brutality made by each group, for the most part they were not supported by the other testimony, particularly the testimony of one witness that someone struck one of the demonstrators with an iron pipe and that another, an old gentleman, hit one of them with a chain.

Additional facts in the record will be referred to in the discussion of law set out below.

■ (1) The State of Georgia has moved to dismiss this action upon the ground that petitioner has not exhausted a remedy accorded to him by the law of Georgia by bringing a habeas corpus petition in the State courts. As authority for its position the State cites a case of Porch v. Cagle, 199 F.2d 865 (5 Cir. 1952) in which the writer granted the writ of habeas corpus and went into the merits of the matter involving a Negro convicted of murder in the State court. The Fifth Circuit Court of Appeals speaking through Judge Russell, dismissed the appeal, stating in part as follows:

"The circumstances here present a case of failure of the appellant to exhaust State remedies before appealing to the Federal Court. The trial Court should not have passed upon

the merits of the petition, but should have dismissed the same."

The Court pointed out:

"The right to the writ of habeas corpus is recognized by the Constitution of Georgia, and provisions implementing the constitutional guarantee are provided by the Georgia Statutes."

The Court points out however, that the Federal Court may consider such applications for habeas corpus,

"where extraordinary circumstances exist,"

ruling, however, that they did not exist in the case cited.

A quite exhaustive discussion is given by the Supreme Court in the case of Fay v. Noia, 372 U.S. 391, beginning at page 399, 83 S.Ct. 822, 9 L.Ed.2d 837. That involved a conviction in a State court. The defendant did not appeal. He applied to the State court for a writ of coram nobis to review his conviction, and it was denied because of his failure to appeal. He then applied to a Federal District Court for a writ of habeas corpus, and the Supreme Court held that it should have been entertained.

Whether or not there exists a conflict between the two cases above cited, this Court will not now determine. This Court is ruling that the unusual circumstances of this case, including the present confinement of the petitioner by the respondent, constitutes such unusual circumstances as to authorize this Court to entertain the writ. Accordingly, this Court has set the matter down for almost immediate trial, a plenary trial has been had, and this Opinion and Judgment (as is quite apparent from a reading of the same) is being written and issued without a full opportunity to edit the same.

(2) Defense counsel also contends that this Court has no jurisdiction because allegedly no notice was given by the State court to this petitioner of two orders by the State court overruling respectively petitioner's motion for a new trial, and his motion in arrest of judgment. While considerable testimony was heard by this Court on that issue, this Court is of the opinion that no ruling is necessary to be made on that factual issue. No Georgia case has been cited to this Court to the effect that copies of said orders were required to be mailed to counsel for petitioner, or that notice should be given to them. There is a conflict in the testimony as to whether such notice was actually mailed. There is evidence tending to show copies of the orders were mailed and there is a denial upon the part of petitioner's attorneys that they were ever received. In Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L. Ed.2d 837, the court ruled as follows:

"Respondent's failure to appeal was not a failure to exhaust the remedies available in the courts of the state as required by 28 U.S.C., § 2254 * * *. A Federal judge may, in his discretion, deny relief to an applicant for habeas corpus who has deliberately by-passed the orderly procedure of State courts, and in so doing has forfeited his State court remedies." (See headnotes 4 and 6(a)).

This Court in its discretion has seen fit to entertain this application, regardless of petitioner's failure, for any reason, to pursue his remedy of appeal in the courts of Georgia. By doing so, however, this Court is not setting a precedent for all future cases.

(3) The motion in arrest of judgment filed in the State court attacks the Act of the Georgia Legislature approved February 18, 1960 (§ 26-3005 of the Georgia Code) as being unconstitutional. The portion complained of reads as follows:

"It shall be unlawful for any person, who is on the premises of another, to refuse and fail to leave said premises when requested to do so by the owner or any person in charge of said premises or the agent or employee of such owner or such person in charge. Any person violating the provisions of this section shall be

guilty of a misdemeanor and upon conviction thereof shall be punished as for a misdemeanor."

The grounds of attack are the following:

"Said portion of the mentioned Act is so vague, incomplete and indefinite as to be insufficient to place the defendant upon notice of the offense for which he was charged thereby preventing him from being able to make a proper defense; nor does said statute set up any standard of conduct by which an owner must be guided in exercising any rights under said section; nor does said section enumerate any standard of conduct by which a defendant, as an ordinary layman and citizen could be guided in exercising his rights to remain on the premises without being arbitrarily or capriciously required to move or leave by the owner. Said section is therefore in derogation of Article I, Section 1, paragraph 3 of the Georgia Constitution, and Section 1 of the Fourteenth Amendment to the United States Constitution. The indictment as drawn therefore fails to charge an offense which is cognizable under the laws of Georgia."

This Court is ruling that the statute is not subject to any of the attacks made upon it and set forth above. See three cases decided by the Supreme Court of Georgia, April 9, 1964, to-wit: Durham v. State, German v. State and Lloyd v. State, Ga., 136 S.E.2d 322; Clark v. State, Ga., 135 S.E.2d 270 (1964).

(4) The controlling question in this case is whether or not the trial judge should after a full hearing have sustained the Plea in Abatement filed in the State court when petitioner was there on trial charged with violation of the above statute.

■ In substance, the Plea in Abatement alleged that the above quoted Georgia statute was "being applied so as to deny this defendant due process of

law and equal protection of law" under the Georgia Constitution and the Fourteenth Amendment to the United States Constitution. It alleged that the statute was being applied so as to "perpetuate a scheme of racial discrimination in place of public accommodation within the City of Atlanta, which has long existed under State sanction through legislative enactments," etc.[3]

The Plea in Abatement further alleged that an Atlanta police officer arrested petitioner and others for failing to leave the restaurant of Lebco, Inc., a licensed place of public accommodation, although petitioner was willing to pay for the service requested, was appropriately dressed, and made the proper approach for such service. Significantly, the Plea in Abatement does not allege that petitioner was otherwise conducting himself in a lawful manner, nor does it negative the facts and circumstances existing at the time of his arrest, as heretofore recited.

Counsel for petitioner cite, as chief authority in support of petitioner's habeas corpus petition, the decision by the United States Supreme Court in the case of Lombard, et al. v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338. A minute study of that decision is required, not only for the purpose of noting what it does decide, but for the purpose of noting what it does not decide.

In the case just cited (involving trespass convictions resulted from an attempt by Negroes to be served in a privately owned restaurant) there was no state statute or city ordinance forbidding desegregation in restaurant facilities, and the court ruled that the case was governed by Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323. See 373 U.S. 268, 83 S.Ct. 1122, 10 L.Ed.2d 338.

In the Lombard case it appeared that three Negro and one white college students entered a store, sat down at a re-

---

3. No Georgia statute or decision has been cited to the Court, nor are there any such, regarding segregation in public accommodations such as restaurants in Georgia.

That such segregation actually exists is a matter of common knowledge, but it is only partial, and not condoned by the City of Atlanta.

freshment counter and requested service, which was refused. The counter accommodated twenty-four persons. The group refused to leave, the counter was closed, the police were called, the demonstrators stated they "were going to sit there until they were gonna be served", they were arrested and taken off in a patrol wagon, tried and convicted under Louisiana's criminal mischief statute, somewhat similar to the Georgia statute above quoted. The Supreme Court of Louisiana affirmed their conviction and certiorari was granted by the United States Supreme Court.

It was pointed out:

"Prior to this occurrence New Orleans city officials * * * had determined that such attempts to secure desegregated service, *though orderly and possibly inoffensive* to local merchants, would not be permitted." P. 269 of 373·U.S., p. 1123 of 83 S.Ct.

The Mayor of New Orleans issued a statement to the effect that he had "directed the superintendent of police that no additional sit-in demonstrations * * * will be permitted * * * regardless of the avowed purpose or intent of the participants." P. 271 of 373 U.S., p. 1124 of 83 S.Ct. The Court pointed out that the "evidence all tended to indicate that the store officials' actions were coerced by the city." P. 273 of 373 U.S., p. 1125 of 83 S.Ct.[4]

The Court stated:

"Equally the State cannot achieve the same result by an official command which has at least as much coercive effect as an ordinance. The official command here was to direct continuance of segregated service in restaurants, and to prohibit any

conduct directed toward its discontinuance; *it was not restricted solely to preserve the public peace in a nondiscriminatory fashion in a situation where violence was present or imminent by reason of public demonstrations.*" (Italics supplied)

In no case prior to the Lombard case, and in no case cited therein, does this Court find a factual situation comparable to the one in the instant case. In the case of Shelley, et ux. v. Kraemer, et ux., 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) it was held that private agreements concerning segregation in covenants concerning real estate did not violate the Fourteenth Amendment, but that actions of the state courts constitute actions of the states, and may deny equal protection of the law. It was pointed out that no individual has the right to demand action by a state which results in the denial of equal protection of laws to other individuals. A similar ruling was made in Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586, also involving a restrictive covenant as to real estate.

In the case of Peterson, et al. v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323, a group of Negro boys and girls entered the S. H. Kress store in Greenville, seated themselves at the lunch counter, and had been sitting there for five minutes when they were arrested under an ordinance of the City making it unlawful for the operator of a restaurant "to furnish meals to white persons and colored persons in the same room." It was pointed out "that the petitioners were clean, well dressed, unoffensive in conduct, and that they sat quietly at the counter which was designed to accommodate 59 persons." P. 247 of 373 U.S., p. 1121 of 83 S.Ct. After

---

4. In passing, it may be said that the present and the prior administrations of the Government of Atlanta and the Police Department have in recent years attempted to show every consideration to the rights of the Negroes in this community. Mr. Lebedin has been quoted by the public press quite frequently, however, as charg- ing that the Atlanta Police Department had failed and refused to give him police protection during the period of time involved in this case. The trial of this case entirely upon the transcript adduced in the State court trial prevents this Court from going into those features.

referring to the ordinance the court said:

"The Kress management, in deciding to exclude Negroes, did precisely what the city law required."

The court pointed out that the convictions had the effect of enforcing such illegal ordinance, stating that

"The State's criminal processes are employed in a way which enforces the discrimination mandated by that law." P. 248 of 373 U.S., p. 1121 of 83 S.Ct.

Justice Harlan, dissenting, referred to the right of the restaurant operator as follows:

"Although the right of a private restaurateur to operate, if he pleases, on a segregated basis is ostensibly left untouched, the Court in truth effectually deprives him of that right in any State where a law like this Greenville ordinance continues to exist. For a choice that can be enforced only by resort to 'selfhelp' has certainly become a greatly diluted right, if it has not indeed been totally destroyed." P. 252 of 373 U.S., p. 1134 of 83 S.Ct.

■ (5) This Court is of the opinion that every restaurant operator and every other business man operating a licensed public establishment, even on a segregated basis, has the right to call upon the police to protect him in such operation as against demonstrators, white or Negro, or both, who are deliberately locking their arms together, prostrating their bodies before the entrance to his establishment, and preventing his patrons from either entering or leaving his establishment. Particularly, is such restaurant operator justified in calling the police when such conduct has caused demonstrations over a period of five months, and causes large groups of citizens to gather about his place and violence ensues.

■ There was a period in English common law when certain persons were not within "the peace of the State," and it was no crime to kill them. Our present indictments still refer to the deceased as being within the "peace of the State." The writer does not believe that the United States Supreme Court has ever intended to rule that the operator of a restaurant, even a segregated restaurant, is not within the "peace of the State," which has been defined as follows:

"The protection, security, and immunity from violence which the State undertakes to secure and extend to all persons within its jurisdiction, and entitled to the benefit of its laws." See Black's Law Dictionary, p. 1286.

This sacred right to the enjoyment of private property and its protection as against wrongdoers, must be balanced against the rights of all free people to demonstrate and exercise their freedom of speech. Even freedom of speech, however, has its limitations. In labor disputes secondary boycotts are outlawed and violations have resulted in many damage suits in favor of the employer.

It is a matter of deep concern to all thoughtful people that our country is now faced with many critical and devisive questions, such as labor unrest, racial unrest, and, most serious of all, a growing disrespect for law and order. The most dangerous aspect of the latter problem is the spread of a spirit of lawlessness among the younger generation, even at the college level, and the curiosity to know the extent of that feeling prompted this Court on the trial of this habeas corpus petition to carefully question Tom Taylor Tolg, a teacher in sociology, twenty-three years of age, studying for a master's degree, as to his views. The following colloquy occurred: (parts are omitted)

Petitioner stated that he had been trying to appeal to the conscience of fellow Americans, and the Court asked him the following:

"Just tell me how it happened to be that you came down here to violate this law and make this test?"

Petitioner answered that he was in Atlanta where he "was in a demonstration with other students, where we very peaceably and non-violently had what is commonly known as a sit-in after being refused service, and then having a crowd surround us."

The Court: "When you came here and accepted employment I assume that you realized that your employment was to be in the nature of doing the sit-in?"

Petitioner: "No sir, I wasn't quite sure what my employment would be, in that I did many other types of work also while I was in Atlanta that I did —that was completely legal."

The Court: "Well, you knew that that was part of the program of the Student Non-Violent Committee, did you not?"

Petitioner: "I knew that was a possibility. Yes sir."

The Court: "I assume that when you and your group were picketing outside this restaurant, it means that customers were not able to get in, and you did block the way, did you not, where customers could not come in and be served?"

Petitioner: "Yes sir."

The Court: "If you are operating a restaurant for profit and anyone prevents customers from coming in, it would eventually bankrupt you wouldn't it?"

Petitioner: "Yes sir."

The Court: "You don't call that force? Duress? Let's say duress?"

Petitioner: "This may be so, sir, although we also accepted force and duress."

The Court: "And you as a teacher of sociology do not think that you are taking the law in your own hands when you do that?"

Petitioner: "We are putting ourselves at the mercy of the law rather than taking the law into our own hands."

The Court: "As a student of sociology, do you not find there is a spirit of law-lessness increasing more and more in this country?"

Petitioner: "Yes."

The Court: "Do you not think that if young people and students are encouraged to violate the law in order to test it, really you are adding to that spirit of lawlessness in the next generation?"

Petitioner: "I think the people who have been in these sit-ins are probably the most lawful citizens we have. They care more about the individual rights of all citizens than many people who are law abiding, but don't have the spirit of the law at all."

The Court: "Well, do you feel that you have the constitutional right to get outside of a man's place of business and keep customers from coming in there?"

Petitioner: "I think I may, yes, in a way."

It is a fundamental rule of statutory construction that a statute will not be construed in a way which will render it unconstitutional if there is a construction which would render it valid. The Georgia Supreme Court in the case of Clark v. State, 135 S.E.2d 270, supra, ruled that the Georgia anti-trespass statute did not violate a person's rights under the due process or equal protection clauses, or the Fourteenth Amendment to the United States Constitution. No court has ever decided as far as the writer knows, that the application of this statute denies any constitutional right to persons under the facts as exist in the instant case. This petitioner admits that he and his group put their bodies at the entrance of "Leb's" restaurant, that customers were not able to come in and leave, thus blocking the entrance, and that such conduct "would eventually bankrupt" the proprietor. He maintained that he had the "constitutional right to get outside of a man's place of business and keep customers from coming in there." Any segregation practiced by "Leb's" restaurant was not induced in any way by the City authorities, nor was

it encouraged. No arrests have been made for some five months prior to the incident in question. As applied to the arrest and prosecution of demonstrators for unlawful overt acts, disrupting a business, the statute would seem to be valid—and that is the question here presented.

A decision by the courts approving the methods pursued by petitioner and his associates in the instant case would clearly deprive the American business man of his right to do business, and it is clear that Mr. Tolg and the organization to which he belongs claim the right to disrupt business and bankrupt any restaurant establishment which practices segregation, and to do that by means other than by legally exercising their right of free speech.

The gravity of the situation facing this nation should such tactics be given the approval of the courts, is not only evidenced by sit-ins and violent demonstrations throughout the country, but by public declaration recently made by a responsible official of the Students Non-Violent Cooperation Committee that these practices would be increased in the future and the coming summer would be "a summer of discontent." All persons charged with enforcing the law and putting the brakes on an apparent movement toward lawlessness are therefore faced with a grave responsibility. Serious consideration should be given to the predicament of the American business man if, when faced by acts of lawlessness, he cannot turn to the police and to the courts for protection. Certainly there is a middle ground on which the law can tread without trampling underfoot the right of equal protection on the one hand, and the right to protection on the other.

This Court being of the opinion that petitioner's conviction and present detention are lawful, a Judgment denying his application for habeas corpus will be entered.