Peter J. SMITH, Plaintiff,

v.

DUQUESNE UNIVERSITY, and Duquesne University Corporation, Defendants.

Civ. A. No. 84–1465.

United States District Court, W.D. Pennsylvania, Civil Division.

May 28, 1985.

Robert W. Murdoch, Pittsburgh, Pa., for plaintiff.

Robert W. Hartland, Pittsburgh, Pa., for defendants.

## OPINION

SIMMONS, District Judge.

Commencing September, 1980, Peter J. Smith, a 48 year old male, was admitted as a doctoral degree candidate to the Duquesne University Graduate Program in English. Ten months later he was dis-

missed from the program for academic reasons. Following Smith's dismissal, this civil rights lawsuit was filed.

In this suit, Smith assails the conditions of his admittance, his grades and classroom treatment as a student, and his dismissal from Duquesne University. Smith complains that the school's conduct violated his constitutional rights to due process and equal protection of the laws. Smith also claims that Duquesne University denied him access to his educational records in violation of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (1974) [Hereinafter cited as FERPA].

At the close of discovery, Duquesne University moved for summary judgment asserting that the institution is a private, not public, entity and therefore its actions are not subject to constitutional scrutiny under 42 U.S.C. § 1983.[1] Duquesne also contends that Smith's complaint under FERPA cannot be maintained because FERPA grants no federal cause of action to private litigants.

## I.  FACTS.

The facts are undisputed. Duquesne University was founded in 1878 by the Holy Ghost Fathers from Germany. When its doors opened it was known as the Catholic College of the Holy Ghost. Four years later, the school incorporated as the Pittsburgh Catholic College. Subsequently, in 1911, the institution's name was changed to Duquesne University. Today, the school's Corporate name is Duquesne University of the Holy Ghost.

Duquesne University of the Holy Ghost is a nonprofit corporation which has no capital stock and whose sole stated purpose is to support and maintain the university for the instruction of youth in all branches of a thorough, moral and secular education. Membership in the corporation is limited by corporate bylaws to members in good standing of the religious society within the Roman Catholic Church known as the Congregation of the Holy Ghost and of the Immaculate Heart of Mary.

The university's corporate board of directors, responsible for oversight and management of the corporation, are elected by members of the corporation. The daily operation of the university is vested in the President, who is the chief executive officer, a Chancellor, various vice presidents, and an administrative council. The administrative council is composed of representatives of the university's officers, faculty members, deans, and members of the student government.

Most of Duquesne University's operating budget is derived from private sources. The university receives some operational funds from the Commonwealth of Pennsylvania in the form of State Institutional Assistance Grants, but the amounts received are de minimis in comparison to the university's overall operational expenses.[2] For example, the university's 1984 operating budget exceeded $40 million, in contrast to the $831,198 state assistance grant

| Academic year | Grant Received |
| --- | --- |
| 1979–1980 | $786,106 |
| 1980–1981 | $794,700 |
| 1981–1982 | $754,200 |
| 1982–1983 | $889,923 |
| 1983–1984 | $831,198 |

For the same years, by contrast, the overall operating budgets for Duquesne University were as follows:

| Fiscal year | Budget |
| --- | --- |
| 1979 | $28,128,760 |
| 1980 | $30,383,323 |
| 1981 | $32,906,428 |
| 1982 | $36,877,545 |
| 1983 | $39,016,270 |
| 1984 | $40,621,163 |

---

1.  Section 1983 provides that:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983 (1979).

2.  Duquesne University received the following amounts in Institutional Assistance Grants from the Commonwealth of Pennsylvania:

the university received against its operating expenses for the 1983–1984 academic school year. The level of funding through state assistance grants is determined by the number of students enrolled at a recipient state institution of higher learning.

Approximately seventy-five percent of Duquesne University's students receive some form of educational financial assistance from a governmentally sponsored program; mostly low interest guaranteed state loans made directly to the student by private lenders and guaranteed by the state. However, the majority of tuition income received by the university comes from private sources. Additionally, the university and individual professors are periodically awarded grants and contracts to perform research or to finance various educational programs, but these amounts have been limited. For the last five academic years, from 1979–1984, research grants and specific program funding has averaged only $678,122 annually.[3]

Duquesne University receives no government grants or gifts of public funds for the construction of its buildings. But the university has borrowed money from both federal and state governments for building construction. To date, the University has borrowed $8,431,000 from the Housing and Urban Development Authority and $12,-795,000 from the Pennsylvania Higher Education Facilities Administration; the balance on those loans are $5,906,000 and $7,406,610, respectively.

## II. DISCUSSION.

### a. State Action Requirement.

The United States Constitution's fifth and fourteenth amendments shield the individual only from governmental action. The "Fourteenth amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982), *citing, Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948).

The fourteenth amendment provides, in pertinent part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. amend. XIV, § 1. Section 1983, which prohibits abridgment of federal rights "under color of state law," was enacted by Congress to enforce the fourteenth amendment. 42 U.S.C. § 1983.[4] Courts have consistently treated the section 1983 "under color of state law" and the fourteenth amendment's "state action" requirements as the same thing. *See United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966). Therefore, state action analysis under the fourteenth amendment and section 1983 are identical.

The standard for whether an entity is subject to constitutional scrutiny under section 1983 and the fourteenth amendment is whether the alleged conduct can be "fairly attributable to the state." *See Lugar v. Edmondson Oil Co*, 457 U.S. 922,

---

3. Duquesne University received the following amounts in research grants from federal and state sponsored programs:

| Academic Year | Research Funds |
|---|---|
| 1979–1980 | $746,286 |
| 1980–1981 | $908,766 |
| 1981–1982 | $403,799 |
| 1982–1983 | $629,602 |
| 1983–1984 | $702,160 |

4. Section 1983 creates a federal cause of action, but does not by itself confer federal jurisdiction on federal courts. The jurisdictional counterpart of section 1983 is 28 U.S.C. § 1343(3) (1948). *See Hagans v. Lavine*, 415 U.S. 528, 534–36, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974). Jurisdiction of this action is sufficiently pled under 28 U.S.C. § 1343(3). Although the complaint fails to expressly invoke section 1983, the omission is not fatal because the complainant factually pled a section 1983 claim, in addi-

937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). To date, there is no uniform test to determine whether state action exist. *Reitman v. Mulkey,* 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967). The United States Supreme Court has, however, adopted several approaches to ascertain what constitutes sufficient state participation with private activity to attribute responsibility to the state. What test applies depends on the circumstances of each case. Only two of the commonly used approaches are appropriate to determine whether state action exist in this case: the "overall interdependence" or "symbiotic relationship" test of *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and the "close nexus" test of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

In *Burton* a private restaurant owner who refused to serve a Negro customer solely because of his race, was subjected to fourteenth amendment scrutiny because the restaurant was located in a public parking garage owned by a state-created parking authority and the rent from the restaurant profited the state. The dispositive factor in *Burton* was the extent and nature of the overall relationship between the state agency and the private entity. There the Supreme Court found state action because the state had "so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton,* 365 U.S. at 725, 81 S.Ct. at 862.

*Jackson* involved a privately owned and operated utility corporation which was subject to extensive state regulation in the operation of its business affairs. When the utility company terminated a customer's electric services without notice, hearing or an opportunity to pay the amount due, the Supreme Court rejected the customer's due process claim because there was not a "sufficiently close nexus between the state and the challenged action ... so that the action of the [private entity] may be fairly treated as that of the State itself." *Jackson,* 419 U.S. at 351, 95 S.Ct. at 453.

Subsequently, in 1982, the Supreme Court decided a trilogy of cases reaffirming the continued viability of the symbiotic relationship, close nexus and public function tests [5] as workable frameworks for state action analysis: *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Of the three cases, the *Lugar* decision is the most factually dissimilar to the present dispute and therefore offers little guidance.

*Rendell-Baker,* on the other hand, involved a section 1983 claim against a privately operated school by teachers who were discharged because they had opposed school policies. The school specialized in dealing with problem high school students, nearly all of whom were referrals by various city school committees from state drug rehabilitation programs. The referring school committees paid the students' tuition and expenses; hence the school received nearly one hundred percent of its funding from public sources. Also, the school was extensively regulated and subject to state-imposed administrative guide-

tion to invoking the protection of the fourteenth amendment.

**5.** The "public function" state action analysis is employed to determine whether the function performed has been "traditionally the exclusive prerogative of the state." *See Jackson v. Metropolitan Edison,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974); *See also Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d

373 (1966); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In cases where the state, by its laws, has compelled a particular act, the "state compulsion" test is used. *See, e.g., Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Peterson v. Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).

lines on personnel policies. *Rendell-Baker,* 457 U.S. at 831–33, 102 S.Ct. at 2766–67.

Although the school in *Rendell-Baker* was heavily regulated, closely supervised and almost totally funded by the state, the Supreme Court held that the teacher firings could not be attributed to the state under the close nexus test because the school's decision to dismiss the teachers had not been "compelled or even influenced by any state regulation" *Id.* at 841, 102 S.Ct. at 2771. The Court also concluded that the school was a private actor under the symbiotic relationship and public function tests. *Id.* at 842–43, 102 S.Ct. at 2772. In *Blum v. Yaretsky,* likewise a section 1983 suit, the Supreme Court again rejected a state action claim using the close nexus, symbiotic relationship and public function tests. The plaintiff in *Blum* raised due process claims to a decision by a privately operated nursing home to transfer medicaid patients from high-care to lower-care facilities under federal law. Though the state subsidized the nursing homes, paid the patients' expenses, licensed and extensively regulated the nursing homes, the Court held that the patient discharge and transfer decisions were not fairly attributable to the state. Those decisions, the Court ruled, ultimately turned on medical judgments made by private entities according to professional, not state, established standards. *Blum,* 457 U.S. at 1008, 102 S.Ct. at 2788.

### i. The Overall Interdependence or Symbiotic Relationship Analysis

The symbiotic relationship test looks to the overall relationship between the state and the asserted state actor. Both *Blum* and *Rendell-Baker* focused on the financial relationship between the defendants and the state, which was the only significant form of state influence over the school in *Rendell-Baker* and the nursing home in *Blum.* The Supreme Court concluded in both cases that the financial relationship between the state and the defendants was insufficient to support a finding of state action. The Court's finding of state action in *Burton,* on the other hand, turned on the total intermingling of state with private action.

Recently, the Third Circuit has reviewed the Commonwealth of Pennsylvania's interrelationship with the University of Pittsburgh and Temple University and concluded that the relationships were "more closely analogous to that complete intermingling of state and private actors found in *Burton* than to the relatively minimal interrelationships between the state and the defendants in *Blum* and *Rendell-Baker.*" *See Krynicky v. University of Pittsburgh,* 742 F.2d 94, 101 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). *See also Braden v. University of Pittsburgh,* 552 F.2d 948 (3d Cir.1977).

The Third Circuit's symbiotic relationship analysis in *Krynicky* and *Braden* is instructive here. In *Krynicky,* the Commonwealth statutorily created and defined its relationship with Temple University and the University of Pittsburgh. Both institutions were statutorily established "as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth System of higher education." *See Krynicky,* 742 F.2d at 102, *citing,* Pa.Stat.Ann. tit. 24, § 2510–202 (Purdon 1966). One-third of the universitys' trustees were selected by the Commonwealth and various elected officials served as trustees ex officio. The institutions received extensive financial support from the Commonwealth which set the institutions' annual appropriations, policy and tuition rates. The schools were statutorily required to submit to state-sponsored audits or make yearly reports to the state assembly. So comprehensive was the statutory relationship between the Commonwealth on the one hand, and the University of Pittsburgh and Temple University on the other, that the *Krynicky* court held that actions taken by the two schools are taken under the color of state law and therefore subject to constitutional challenges. *Id.* at 103.

■ By contrast, the interrelationship between the Commonwealth of Pennsylvania and Duquesne University is so tenuous as to lead to no other conclusion but that

Duquesne is a private institution and not a state actor. In fact, the interrelationship between Duquesne University and the Commonwealth is more tenuous than, as the Third Circuit noted in *Krynicky*, "the relatively minimal relationship between the state and the defendants in *Blum* and *Rendell-Baker*." *Krynicky*, 742 F.2d at 101. Unlike the University of Pittsburgh and Temple University in *Krynicky*, the Commonwealth of Pennsylvania has never statutorily or otherwise "accepted responsibility" for Duquesne or established Duquesne "as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth System of higher education." *Id.* at 102. In short, there is no statutory interrelationship between the state and Duquesne University: the state does not participate in the management or operation of Duquesne, review the institution's expenditures, nor require the institution to submit voluminous financial reports to the state.

The uncontroverted record also establishes that neither the Commonwealth nor any government agency exercise any power or exert any meaningful control or influence over Duquesne University's policy or operational decision-making process. *Accord Pendrell v. Chatham College*, 370 F.Supp. 494 (W.D.Pa.1974). The university's entire administrative hierarchy is devoid of any governmental involvement. The university's corporate members are exclusively Holy Ghost Priest and, unlike Temple University and the University of Pittsburgh in the *Krynicky* case, none of Duquesne University's officers are local, state or federal government employees or elected representatives.

Finally, the state's financial contributions to Duquesne University are comparatively minuscule in relationship to the institution's overall operational expenses. At any rate, absent other indicia of inexplicable state and school interdependence, the Supreme Court has made it unequivocally clear in *Blum* and *Rendell-Baker* that state contributions to otherwise private entities, no matter how substantial, does not in itself transform a private actor into a state actor; something more is required. *See Krynicky* 742 F.2d at 102.

In sum, under the symbiotic relationship test, this Court can find no state action.

## ii. The Close Nexus Analysis.

■ The close nexus test, instead of assaying the overall relationship between the parties, seeks to determine whether the state can be deemed responsible for the specific act of which the plaintiff complains. *See Community Medical Center v. Emergency Medical Services*, 712 F.2d 878, 881 (3d Cir.1983). Where the state is closely involved in the very activity challenged by a litigant, although the actor is otherwise a private entity, the conduct may be subject to constitutional strictures. *See Braden v. University of Pittsburgh*, 552 F.2d 948, 958 (3d Cir.1977). A state "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

■ In this action, Smith complains of his treatment as a student and his dismissal from Duquesne University. Under the close nexus approach, this case requires no protracted analysis to determine that Duquesne's decision to dismiss Smith cannot fairly be attributable to the Commonwealth. Here it is beyond peradventure that the decision to discharge Smith from Duquesne's graduate English department was not compelled or influenced by any state regulation. Nor can it be fairly said that the Commonwealth was even remotely or indirectly involved in that decision. The decision to expel Smith, like the decision to matriculate him, turned on an academic judgment made by a purely private institution according to its official university policy. If indirect involvement is insufficient to establish state action, then certainly the lack of any involvement cannot suffice. *See Community Medical Center*, 712 F.2d at 881.

b. **Private Cause of Action Under The Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.**

Smith also complains that Duquesne University abridged his right to inspect and review his educational records and denied him the right to a hearing to request correction of his educational records, all Smith asserts, in violation of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (1974) [FERPA].[6]

■ That a federal law has been violated and someone harmed does not, of itself, give rise to a private federal cause of action in favor of the aggrieved person. *See Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). Here, FERPA does not expressly provide a private remedy. To determine whether a private cause of action is implicit in a federal statute not expressly providing one, the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), espoused a four-prong test to discern congressional intent.

*Cort's* threshold consideration for determining whether a private remedy should be implied is whether the plaintiff is a member of the class for whose especial benefit FERPA was created. *Id.* at 78, 95 S.Ct. at 2088. In this regard, the Supreme Court has noted that the most accurate indicator of whether a privately enforceable remedy should be implied is the duty- or right-creating language in the statute itself. *Cannon*, 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13. Where the language of the statute expressly identifies the special class to be benefited, in contrast to language merely for the protection of the general public, the Supreme Court has consistently held that a private cause of action is implicit in the statute. *See, e.g., Sullivan v. Little Hunting Park*, 396 U.S. 229, 238, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969); *Jones v. Mayer Co.*, 392 U.S. 409, 414–15, 88 S.Ct. 2186, 2189–90, 20 L.Ed.2d 1189 (1968) ("All citizens of the United States shall have the same right to …"); *Allen v. State Board of Electons*, 393 U.S. 544, 554–55, 89 S.Ct. 817, 825–26, 22 L.Ed.2d 1 (1969) ("no person shall be denied the right to vote …."); *Tunstall v. Brotherhood*, 323 U.S. 210, 213, 65 S.Ct. 235, 237, 89 L.Ed. 187 (1944) ("Employees shall have the right to organize and bargain collectively….").

*Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), is instructive on this point. In *Cannon* the Supreme Court held that, despite the absence of express congressional authorization, a private cause of action existed to enforce Title IX of the Education Amendments of 1972. Title IX prohibits sex discrimination in educational programs. There the Supreme Court drew a pointed distinction between the more pungent "no person shall be discriminated against" language of Title IX in contrast to statutory language simply phrased as a directive to federal agencies, such as, "the Secretary shall not grant funds to discriminatory institutions." *Id.* at 692–93, 99 S.Ct. 1946. The Supreme Court gave weighted consideration to the fact that, when adopting Title IX, Congress rejected "the Secretary shall not" language and instead opted for the "no person shall" language. For this reason, the Court held that Title IX was

---

**6.** Section 1232g of FERPA provides in relevant parts that:

(a)(1)(A) No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students … the right to inspect and review the education records of their children.

. . . .

(2) No funds shall be made available under any applicable program to any educational agency or institution unless the parents of students … are provided an opportunity for a hearing by such agency … to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy or other rights of students, and to provide an opportunity for the correction or deletion [of any inaccuracies].

. . . .

(b)(1) No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of educational records … of students without the written consent of their parents to any individual, agency or organization . . . .

drafted with an unmistakable focus on the benefited class and therefore a private remedy could be properly implied. *Id.* at 693–94, 99 S.Ct. at 1955–56.

By contrast, the dispositive language in FERPA disfavors the implication of a private remedy. Unlike the rigidly prohibitive language of Title IX, FERPA is simply a directive to the Secretary of Education, which prohibits the distribution of public funds as a sanction against schools which deny students the right to inspect and review their educational records. In this regard, FERPA's language is similar to that rejected by Congress for Title IX—language which does not expressly identify the benefited class and the type of language which the Supreme Court opined was not specific enough to warrant an implied private remedy. *Cannon,* 441 U.S. at 694–95, 99 S.Ct. at 1956–57.

The second question under *Cort* is whether the statute's legislative history indicates a congressional intent to create or deny a private cause of action. *Cort,* 422 U.S. at 78, 95 S.Ct. at 2088. Not surprisingly, the legislative history of FERPA is silent on this point. Under *Cort's* third prong, a private remedy will not be implied if it is inconsistent with the underlying legislative scheme of FERPA. If however, a private remedy furthers the statutory purpose, courts are decidedly more responsive to its implication. *See Cannon,* 441 U.S. at 703, 99 S.Ct. at 1961. In this instance, a private remedy would not materially aid FERPA's primary congressional goal.

FERPA's legislative history indicates that it is principally a right to privacy of educational records act. *See* 120 Cong.Rec. S39858 (daily ed. Dec. 13. 1974) (joint remarks of Sen. Buckley and Sen. Pell). *See also* Education Amendments of 1974, S.Rep. No. 93–1026, 93d Cong.2d. Sess. 186, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4093, 4250. FERPA was adopted as a response to a growing nationwide concern that no provisions existed to protect school records from unauthorized use. With the threat of financial sanctions, FERPA seeks to deter schools from indiscriminately releasing student records and places a heavy burden on a party seeking access to student records to demonstrate a genuine need which outweighs the student's privacy interest. *Id.*

In addition, enforcement of FERPA is lodged with the Secretary of Education. *See* 20 U.S.C. § 1232g(f). Pursuant to its congressional mandate, the Department of Education has adopted an elaborate enforcement mechanism which includes an adjudication procedure and a review board to resolve complaints regarding FERPA violations. *See* Privacy Right of Parents and Students, 34 C.F.R. § 99.60–61 (1984).

Against this background, it is clear that FERPA was adopted to address systematic, not individual, violations of students' privacy and confidentiality rights through unauthorized releases of sensitive educational records. The underlying purpose of FERPA was not to grant individual students a right to privacy or access to educational records, but to stem the growing policy of many institutions to carelessly release student records.

■ The final prong of the *Cort* test, whether the subject matter is traditionally relegated to the state, *Cort,* 422 U.S. at 78, 95 S.Ct. at 2088, does not aid the Court in its analysis of this case. In sum, it is enough to say that prosecution of isolated FERPA violations in federal courts does little to abate the overriding congressional concerns embodied in the act. For this reason, this Court holds that the relevant considerations adopted in the *Cort* decision—to determine whether a federal statute can be privately enforced—preponderates heavily against the implication of a private federal remedy for FERPA violations. Absent an express congressional directive, this Court declines to hold that a private litigant may enforce the mandates of FERPA in federal courts.

Both the plaintiff's section 1983 state action claim and the FERPA private remedy claim fall as a matter of law, therefore the defendant is entitled to summary judgment.