**WESTPAC AUDIOTEXT, INC., et al., Plaintiffs,**

**v.**

**G. Mitchell WILKS, et al., Defendants.**

**No. C–89–2962 FMS.**

United States District Court,
N.D. California.

Jan. 30, 1991.

Earl Nicholas Selby, Palo Alto, Cal., William Bennett Turner, Donna Brorby, Beth S. Brinkman, Turner & Brorby, San Francisco, Cal., for plaintiffs.

Alan D. Croll, Karen Randall, Mark A. Wooster, Wyman, Bautzer, Kuchel & Silbert, Los Angeles, Cal., Martin J. Jenkins, San Francisco, Cal., for Pacific Bell.

Janice E. Kerr, J. Calvin Simpson, Patrick S. Berdge, Public Utilities Com'n of State of Cal., San Francisco, Cal., for California Public Utilities Com'n.

## MEMORANDUM OF DECISION RE STATE ACTION

FERN M. SMITH, District Judge.

State action is a murky, intensely fact-bound inquiry, which often reduces to an easy-to-frame but hard-to-answer issue: How much state "encouragement" of private conduct is enough to transform that private conduct into "state action"?

In 1988, the California Legislature amended the Public Utilities Code to say that telephone billing and collection services available to "harmful matter" informa-

tion providers are not subject to the control of the California Public Utilities Commission ("CPUC"), "but are a matter for contractual arrangement between the telephone corporation and the information provider." Cal.Pub.Util.Code § 2884.2(a) (West Supp.1991) (hereafter "section 2884.-2").

Defendants Pacific Bell ("PacBell") and GTE California ("GTEC") have attempted to withhold billing and collection procedures from plaintiffs, the providers and listeners of sexually explicit, non-obscene telephone services often referred to as "dial-a-porn." [1] Without billing and collection services, plaintiffs will soon go out of business.

Plaintiffs argue that the first amendment protects their rights to speak freely, to receive information freely, and to associate freely. Defendants contend that the first amendment controls governmental conduct, not the conduct of private corporations. The issue, in a nutshell, is whether GTEC and PacBell are "state actors" and, therefore, subject to the first amendment.

A close examination of the relationship between the state of California and defendants indicates that the state has encouraged the phone companies' efforts to suppress dial-a-porn providers in ways sufficient to find that plaintiffs will probably succeed on the merits of their state action argument.

## FINDINGS OF FACT

The following findings in support of this Court's state action ruling do not alter the procedural posture of this case; the Court's Order of October 27, 1989 remains in effect. In that Order, the Court entered a preliminary injunction against PacBell, but reserved decision on the state action issues raised by section 2884.2. The recent addition of GTEC as a defendant has required the Court to revisit the state action issue as to both phone companies.

The evidentiary requirements for preliminary injunctions are less strict than those in motions for summary judgment, and the weight given to the affidavits and other evidence is a matter for the Court's discretion. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2949 at 470–75 (1973). The bulk of the Court's findings are based on legislative history and other public documents, evidence that would be admissible at trial. Fed.R.Evid. 803(8); 902(4); 902(5); 1005.

The statute at issue here, California Public Utilities Code section 2884.2, had its origins in Senate Bill 1844 (Stats.1988, ch. 1261, § 1). That bill was sponsored by PacBell and introduced by State Senator Russell in January 1988. Its aim was to reverse the CPUC's "content neutral policy" with respect to adult information providers. *See* CPUC Dec. 87–01–042 at 35, ¶ 16; CPUC Dec. 88–07–40 at 2.

As PacBell and its legislative allies shepherded the bill towards enactment, the focus of SB 1844 became increasingly narrow. The original version would have divested the CPUC of jurisdiction over all rates that the phone companies were charging all information providers. The statute was refined in March 1988 to oust the CPUC of jurisdiction over billing and collection services that the phone companies provided to all live or recorded audio or interactive messages. The phone companies' billing and collection services, the draft bill stated, "are not subject to the jurisdiction and control of the [CPUC] but are a matter for contractual arrangement between the telephone corporation and the information provider." Sen. Bill 1844, March 1, 1988 version.

The legislative analyst's report noted that PacBell had sponsored the bill "to fight offensive messages being offered over its 976 information network." The report continued: "With billing and collection as a deregulated service, Pacific Bell says they [sic] could better choose who, or who not, to be associated with by freely

---

**1.** For the purposes of this Memorandum, the speech involved is assumed to be indecent, but not obscene.

offering its billing and collection services as 'a private decision, not reviewed by and not sanctioned by government.'" Sen. Comm.Report, SB 1844, March 22, 1988, at 2 (internal quote to what was apparently a PacBell document was supplied by analyst). The report also informed the legislators of PacBell's claim that "deregulating state authority over billing and collection services would make possible *First Amendment rights issues* ... irrelevant because any decision about providing billing services to 976 providers would become a private decision" not subject to state regulation. *Id.* at 3 (emphasis in original).

Underscoring the legislature's knowledge that PacBell was attempting an end-run around potential first amendment problems, the analyst suggested that the bill might benefit by "adding language to clarify [PacBell's] intent of specifically attacking dial-a-porn providers." *Id.* at 4. *See also* Assemb.Comm.Report, SB 1844, June 13, 1988 at 2–3 (PacBell originally sought to avoid content-based language in the bill because it wanted its decision to withhold services to be "free of a constitutional taint."). The additional language was needed to correct a fundamental problem with earlier versions of the bill—the means proposed were far too broad to achieve the bill's relatively narrow ends. If the goal was to attack dial-a-porn, there was no need to divest the CPUC of jurisdiction over *all* information providers.

The final version of SB 1844 followed the analyst's suggestion and clarified the specific intent to attack dial-a-porn. Codified as section 2884.2, it provided that the CPUC would not have jurisdiction over the billing and collection services that the phone companies rendered to harmful matter providers.[2] These billing and collection services would be "a matter for contractual arrangement between the telephone corpo-

ration and the information provider." Section 2884.2 went into effect on January 1, 1989. CPUC Dec. 89–02–066, Feb. 24, 1989, at 33.

After obtaining legislative approval, Pac-Bell moved on to the CPUC. On February 24, 1989, the CPUC issued a lengthy decision approving a settlement with PacBell regarding the tariff for PacBell's Information Calling Services.[3] *Id.* The settlement involved PacBell's new "900 Information Calling Services," which set up area code 900 for certain pre-recorded messages, live group conversations, interactive messages, and similar services on a wide variety of subjects. A portion of the CPUC decision was entitled, "Is the 900 Settlement Consistent with the Law."

The CPUC decision reviewed three pieces of new legislation, including section 2884.2, and concluded that the settlement was inconsistent with section 2884.2. "The settlement includes tariff terms which regulate billing and collection practices for all [information providers], including those who offer services containing harmful matter. To conform to [section 2884.2], the tariff should expressly exclude [information providers] of harmful matter from the terms which regulate all billing and collection practices." CPUC Dec. 89–02–066 *supra*, at 33. The CPUC's rationale was that, because billing and collection practices regarding harmful matter providers were no longer within the jurisdiction of the CPUC, the settlement could not regulate those billing and collection services at all. *See id.*

Emphasizing PacBell's freedom to contract as it saw fit, the CPUC decision noted, "Regardless of whether the telephone company *chooses* to make independent contractual arrangement for billing and collection of messages containing harmful matter, the tariff should not restrict the transportation of any lawful message or commu-

---

**2.** The California Penal Code section 313(a) defines harmful matter as:

matter, taken as a whole, which to the average person applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks

serious literary, artistic, political, or scientific value *for minors.*

Cal.Penal Code § 313(a) (West Supp.1991) (emphasis added).

**3.** A public utility's tariff is a written statement of the rates, terms, and conditions applicable to a utility's services.

nication" (emphasis added). *Id.* The opinion reiterated that the 900 settlement should be modified to state: "The tariff should not apply to the billing and collection of services which contain harmful matter. Billing and collection for these services are a matter for contractual arrangement between the telephone corporation and the [information provider]." *Id.* at 34–35.

By conditioning approval of the overall 900 settlement on PacBell's willingness to remove harmful matter providers from the proposed tariff, the CPUC gave PacBell a powerful economic incentive to distance itself from the harmful matter providers. *See id.* (setting forth the ways in which the proposed 900 settlement had to be modified to comply with the new statutory scheme).[4] Evidence indicates that the CPUC and PacBell worked closely together fine-tuning the 900 regulatory scheme. N. Selby dec. ¶¶ 25–27, Aug. 16, 1989.

The end result was that entry into the potentially lucrative 900 business was conditioned on the terms imposed by the CPUC. At the same time, PacBell continued doing everything it could on the legislative and regulatory fronts to enable it to avoid entering into "contractual arrangement[s]" with the harmful matter providers.

Thus, when the CPUC applied the provisions of the bill PacBell sponsored to the tariff that PacBell had applied for, PacBell achieved its goal—the removal of state regulatory authority over some of its services. This allowed PacBell to attempt to cut off billing and collection services to the harmful matter providers. Sen.Comm.Report, *supra,* at 2.

Given these facts, plaintiffs have demonstrated sufficient state "encouragement" of the telephone companies' conduct to warrant a finding of substantial likelihood of success on the merits on the state action issue. Today, in California, a phone company's decision not to contract with a harmful

matter provider is a decision that appears fairly attributable to the state.

## DISCUSSION

### I. Background law.

The fourteenth amendment to the Constitution provides a check on government conduct, not private conduct. It incorporates most of the protections of the Bill of Rights and makes them applicable to the states. *See Near v. Minnesota,* 283 U.S. 697, 701, 51 S.Ct. 625, 626, 75 L.Ed. 1357 (1931) (first amendment held applicable to the states).

Plaintiffs alleged that defendants have infringed upon their free speech rights. To prove a violation of their first amendment rights, plaintiffs must show they were harmed by "state action," not by private conduct that abridged their rights. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 721–22, 81 S.Ct. 856, 859–60, 6 L.Ed.2d 45 (1961); 2 R. Rotunda, J. Nowak, J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 16.1 (1986). In a case like this one, in which the plaintiff alleges that a private party's conduct must be attributed to the state because it involved "state action," the plaintiff must show that the state "has provided *such* significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (emphasis added) (citations omitted).

How much encouragement is enough? A careful examination of the facts, in light of the applicable precedents, compels this Court to conclude that "enough" is present here to warrant the preliminary injunction already in effect.

### II. Prior decisions on "free choice" schemes.

The phone companies argue that the "contractual arrangement" language of section 2884.2 gives them the "free choice"

---

**4.** *Cf. Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291, 1297 n. 5 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) (state's imposition of certain conditions on utility's receipt of benefits could be unconstitutional).

to cut off billing and collection services if they so choose. "Free choice" schemes have a long and insidious history in constitutional law.[5]

The free choice plan that was struck down in *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), sheds light on this case. *Reitman* involved an amendment to the California constitution that attempted to bar the state from abridging the rights of homeowners to deal or not to deal with anyone they saw fit, in their "absolute discretion," when selling or leasing their homes. The effect of the amendment would have been to repeal California's Unruh Act, which had outlawed most forms of private racial discrimination. The California Supreme Court concluded that the only conceivable purpose of the amendment was to authorize the perpetuation of private discrimination in the housing market, thereby unconstitutionally involving the state in racial discrimination. The United States Supreme Court agreed.

> Here the California court, armed as it was with the knowledge of the facts and circumstances concerning the passage and potential impact of § 26, and familiar with the milieu in which that provision would operate, has determined that the provision would involve the State in private racial discriminations to an unconstitutional degree. We accept this holding of the California court.

*Reitman*, 387 U.S. at 378–79, 87 S.Ct. at 1633. In reaching this conclusion, the Supreme Court reviewed earlier decisions, including *Burton*, and two of the "lunch counter sit-in" cases. It noted that these cases require an assessment of "whether the State has significantly involved itself with invidious discriminations." *Reitman*, 387 U.S. at 380, 87 S.Ct. at 1634. It then asserted that the California amendment "was intended to authorize, and does au-

thorize, racial discrimination in the housing market." *Id.* at 381, 87 S.Ct. at 1634.

*Reitman* is highly analogous to the fact pattern present here. Both *Reitman* and this case deal with an area of private conduct that was not addressed initially by the state's lawmakers, was subsequently regulated by those lawmakers, and was ultimately deregulated. It is the third step in that process, the deregulation of previously regulated conduct, that raises constitutional difficulties when the state is deemed to have encouraged the private conduct by deregulating it.

In the *Westpac* litigation, as in *Reitman*, there was a period of time during which the legislature had never addressed the private conduct at issue. The phone companies were presumably free to bill and collect for whomever they chose, just as California's homeowners were free to take the buyer's race into account when selling their homes. The state then implemented statutory and regulatory schemes that outlawed certain private conduct (content-based discrimination by the phone companies, racial discrimination by individuals). *See* CPUC Dec. 87–01–042 at 35, ¶ 16; CPUC Dec. 88–07–40 at 2 (CPUC's "content neutral" policy). The final step occurred when the state changed its law to allow free choice in matters that had previously been regulated. Harmful matter providers were left to "contractual arrangements" with monopolies that refused to deal with them, and African–American home-buyers were left to the "absolute discretion" of the sellers. The touchstone of the *Reitman* result was the state's intentional and significant involvement in the wrongful conduct by private parties.

Scholarly justifications of *Reitman* emphasize that California had amended its state constitution, not simply repealed its open housing laws. By incorporating the right to discriminate into the state constitu-

---

5. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (no free choice not to sell to African–Americans); *Green v. County School Board*, 391 U.S. 430, 439–41, 88 S.Ct. 1689, 1694–96, 20 L.Ed.2d 716 (1968) (no free choice of public school where effect was to perpetuate segregation). While these cases are obviously distinguishable in many respects, they do illustrate that the Supreme Court has often rejected both privately-asserted and state-created "free choice" schemes when it recognized that the exercise of that free choice threatened other important constitutional rights.

tion, the amendment put additional barriers in the path of those seeking to get fair housing laws enacted. Rotunda, *supra*, § 18.8 at 404; L. Tribe, *American Constitutional Law* § 18–3 at 1700 (2d ed. 1988). Even Justice Harlan's dissent, however, took pains to distinguish laws which *"passively permit* private discrimination" from situations "where the Court found *active involvement* of state agencies and officials in specific acts of discrimination." *Reitman*, 387 U.S. at 395, 87 S.Ct. at 1641 (Harlan, J., dissenting) (emphasis added).

A bald finding by this Court that the passage of section 2884.2, in and of itself, amounted to state encouragement would be open to Justice Harlan's powerful criticism:

> [P]eople who want to discriminate but were previously forbidden to do so by state law are now left free because the State has chosen to have no law on the subject at all. Obviously whenever there is a change in the law it will have resulted from the concerted activity of those who desire the change, and its enactment will allow those supporting the legislation to pursue their private goals.

*Id.* at 394, 87 S.Ct. at 1640–41. What the defendants' briefs fail to acknowledge is that *Reitman* engaged in a careful, sensitive inquiry into the circumstances in which the amendment was passed. *Reitman* explicitly authorizes an examination of a free choice statute "in terms of its immediate objective, its ultimate effect, and its historical context and the conditions existing prior to its enactment." 387 U.S. at 373, 87 S.Ct. at 1630 (internal quotations omitted). Only then can it be determined whether private persons exercising their free choices, pursuant to the new statute, are state actors.

More recent state action cases tend to characterize the challenged private conduct as having a "close nexus" with the state or being "fairly attributable" to it, but *Reitman*'s examination of the motives, effects, and backgrounds of a free choice statute remains valid. Moreover, the ultimate question, and the Court's way of framing it, have not changed in the twenty-five years since *Reitman*—has the state be-

come "significantly involved" in discriminatory private conduct by offering some quantum of overt or covert "significant encouragement" to that conduct? *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786; *Reitman*, 387 U.S. at 378, 380, 87 S.Ct. at 1632, 1633.

With *Reitman* as its guide, this Court now turns to more recent cases supporting the conclusion that section 2884.2 "was intended to authorize, and does authorize," first amendment violations. *See Reitman*, 387 U.S. at 381, 87 S.Ct. at 1634.

### III. Factors assessed in the state action determination.

In holding that the phone companies are state actors, the Court has examined the relevant precedents and identified five factors that the Supreme Court views as important in determining the presence of state action. It has then engaged in a careful sifting of facts and weighing of circumstances in order to find non-obvious involvement by the state in private conduct. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) (creditor's pre-judgment attachment held state action); *Burton*, 365 U.S. at 722, 81 S.Ct. at 860. The five factors addressed are: (1) the ultimate effect of the statute, *Reitman*, 387 U.S. at 373, 87 S.Ct. at 1629; (2) the immediate objective of the statute, *id.;* (3) the social and historical context of the statute, *id.;* (4) the extent to which the private party acted together with state officials or obtained their significant aid, *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753; and (5) the existence of a state-created framework allowing the exercise of the challenged individual conduct, *id.* The first factor is neutral; the remaining four support a state action finding in this case.

This Court concludes that the "close nexus" between the state and the phone companies' attempts to eliminate dial-a-porn compels the conclusion that the actions of the companies "may be fairly treated as [those] of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477

(1974), *quoted in NCAA v. Tarkanian*, 488 U.S. 179, 192 n. 12, 109 S.Ct. 454, 462 n. 12, 102 L.Ed.2d 469 (1988). The finding of a sufficiently "close nexus", i.e. of "enough encouragement," rests upon the following application of the five factors set forth above.

### A. Effect.

The effect of section 2884.2 is not seriously contested. The phone companies intend to cut off billing and collection services to all harmful matter providers. These providers will then go out of business because they will be unable to bill their callers for the calls in an economically feasible way.

As this Court has stated repeatedly from the bench, it has no desire to place plaintiffs in a better position than other information providers. Furthermore, if marketplace forces alone eventually drive plaintiffs and other harmful matter providers out of business, only a few would regret their demise.

Nevertheless, the state and private parties may not achieve a salutary effect by constitutionally impermissible means. Because *Reitman* dictates an inquiry into the statute's effect, and because the effect here is the suppression of constitutionally protected speech, the Court must examine the state's role carefully.

The "effect" portion of the *Reitman* approach does not point for or against state action in any particular case. It does, however, highlight the importance of the interests at stake.

### B. Objective.

The legislature's objective in passing the statute is relevant to the state action inquiry. *Reitman*, 387 U.S. at 373, 87 S.Ct. at 1629. The Court should inquire as to whether the state and the private party whose conduct is sought to be attributed to the state have interests that coincide. *Tar-*

*kanian*, 488 U.S. at 196 n. 16, 109 S.Ct. at 464 n. 16. Moreover, the Court has an obligation not to blind itself to realities that any reader of the legislative history could readily perceive. *See* L. Tribe, *supra*, § 12–6 at 822 n. 9 (collecting cases and authorities).

PacBell's objective in sponsoring the legislation was to put plaintiffs out of business. The legislature's objective appears identical to PacBell's. Support for this conclusion comes from the remarks of the legislative analyst suggesting that the bill be amended to make it clear that the bill was aimed at "specifically attacking dial-a-porn providers." While it is possible that PacBell and the legislature had different motives for wanting to see the bill passed, it is their shared objectives, not shared motives, that matter. *See Reitman*, 387 U.S. at 373, 87 S.Ct. at 1629; *Tarkanian*, 488 U.S. at 196 n. 16, 109 S.Ct. at 464 n. 16.

This evidence strongly suggests that the legislature was attempting to do indirectly what it could not do directly—attack a class of information providers whose speech is constitutionally protected. The conclusion that the private parties and the state shared a common objective points toward a finding of state action.

### C. Context.

*Reitman* authorizes an inquiry into the social and historical context of the enactment of the statute. 387 U.S. at 373, 87 S.Ct. at 1629. For that reason, this Court relies in part on the California Supreme Court's description of the relationship between the phone companies and the state in *Gay Law Students Ass'n v. Pacific Tel. & Tel. Co.*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979). Though it is important to emphasize that *Gay Law Students* was a holding under *state* constitutional law, 24 Cal.3d at 467–75, 156 Cal.Rptr. 14, 595 P.2d 592, the case warrants close attention.[6] *Cf. Reitman*, 387 U.S. at 378–79, 87

---

**6.** As a theoretical matter, it would be possible to find that a utility is a state actor under the California constitution, but not under the United States Constitution. The California Supreme Court sidestepped this issue, and simply noted

in dicta that it believed that the federal authorities were consistent with its approach. *Id.* 24 Cal.3d at 472, 156 Cal.Rptr. 14, 595 P.2d 592; *see id.* at 473 n. 9, 156 Cal.Rptr. 14, 595 P.2d 592 (noting that *Jackson*'s holding of no state action

S.Ct. at 1632–33 (deferring to the California court's knowledge of the facts, circumstances, and milieu of the "free choice" amendment).

The California Supreme Court in *Gay Law Students* observed,

In California a public utility is in many respects more akin to a governmental entity than to a purely private employer. In this state, the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct, both in the public's perception and in the utility's day-to-day activities. Moreover, the nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more like a governmental entity than like a private corporation.

24 Cal.3d at 469, 156 Cal.Rptr. 14, 595 P.2d 592. Noting that the state sets a utility's rates, regulates its accounting practices, scrutinizes its security offerings, and gives it "considerable powers generally enjoyed only by governmental entities, most notably the power of eminent domain," the Court held: "We believe that the state cannot avoid responsibility for a utility's systematic business practices and that a public utility may not properly claim prerogatives of 'private autonomy' that may possibly attach to a purely private enterprise." *Id.* at 470, 156 Cal.Rptr. 14, 595 P.2d 592 (citation omitted).

*Gay Law Students* supports the proposition that, in California, the phone companies and the state have a long history of close ties. They are closely linked in the public eye, and a significant portion of the public may impute the companies' actions to the state.

Appearances matter. The reality of the public's longstanding identification of the phone companies with the state, a fact recognized by the California Supreme Court, does not automatically transform the utilities into state actors under the federal constitution. But it does weigh heavily in favor of a finding that the phone compa-

nies' conduct is fairly attributable to the state.

D. Relationship with state officials.

The fourth of the five factors applied here is the extent to which the state and the private actors teamed-up to suppress speech. Several cases have held that when a private party acts in concert with a governmental actor in order to deprive a third party of constitutional rights, that private actor is a joint participant with the state and is deemed a state actor. In *Burton,* 365 U.S. at 725, 81 S.Ct. at 861, the Court held that a private restaurant that leased space from a public parking garage had violated the fourteenth amendment when it refused to serve black customers. In *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–87, 66 L.Ed.2d 185 (1980), the Court held that private parties who had conspired to bribe a judge were acting under color of state law because they were "jointly engaged with state officials in the challenged action...." In *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152–53, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970), the Court found triable issues of fact as to whether the private restaurant employee had "somehow reached an understanding" with a police officer to deprive plaintiff of her constitutional rights, thereby making the restaurant a state actor.

These cases all involve the same inquiry that was present in *Lugar,* and the same inquiry that is present here—whether the private party's conduct can be "ascribed to any governmental decision." *Lugar,* 457 U.S. at 937–38, 102 S.Ct. at 2753–54, citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). If the governmental decision is "unconnected" to the discriminatory policies of the private actor, no state action is present.

The evidence presented raises a powerful inference that the phone companies and the state, acting together, hoped to put dial-a-porn out of business. The phone companies are not merely beneficiaries of the give-and-take of the legislative process. Their size, monopoly status, and extensive

has been "strongly criticized" and is "clearly

distinguishable").

regulatory links with the state make them, to some extent, the forces that control the formulation of the laws that then regulate them. The companies "sponsor" bills, Sen. Comm.Report, March 22, 1988, at 2; the companies get what they "need" from legislation, *id.;* and bills are modified to reflect the "intent" of the companies. *Id.* at 4.

Plaintiffs do not suggest and the facts do not imply corrupt behavior on anyone's part. *Cf. Dennis,* 449 U.S. 24, 101 S.Ct. 183. There is, however, extensive evidence that the legislature, the CPUC, and PacBell reached a joint understanding under which a statutory "free choice" scheme would enable the phone companies and the legislature to achieve their shared objective. PacBell was a "willful participant in joint activity with the state or its agents." *Sable Communications v. Pacific Tel. & Tel. Co.,* 890 F.2d 184, 189 (9th Cir.1989) (internal quotations omitted). A decision to withhold billing and collection, pursuant to section 2884.2, is ascribable to the state's decision to pass legislation that was an attempt to "make possible First Amendment rights issues ... irrelevant." Sen. Comm.Report, March 22, 1988, at 3. *See Lugar,* 457 U.S. at 938, 102 S.Ct. at 2754.

The inquiry into the nature of the relationship between the state and the private parties therefore points toward a finding of state action.

### E. State-created framework.

State action can occur when "the State creates the legal framework governing the conduct." *Tarkanian,* 488 U.S. at 192, 109 S.Ct. at 462; *see also Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 487, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988) (intimate, pervasive, and substantial state involvement in private parties' use of state procedure held state action); *Sable Communications,* 890 F.2d at 189.

As *Lugar* puts it, the Court must determine whether the deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State...." 457 U.S. at

937, 102 S.Ct. at 2753. The question is thus whether a state-created framework "caused" the phone companies to attempt content-based discrimination.

The Court finds that the legislature's passing of section 2884.2 "caused" the phone companies to attempt to exercise newly-created rights, namely the right to discriminate in the provision of billing and collection services on the basis of content. The passage of the new statute, like the state's amendment to its constitution in *Reitman,* enabled and empowered private parties to engage in conduct that had previously been prohibited. But for the new statute, the phone companies would not, and could not, attempt to discriminate.

Formerly, the companies had to provide billing and collection services to harmful matter providers on the same basis that they provided those services to other information providers. CPUC Dec. 87–01–042 at 35. The statute at issue subsequently singled plaintiffs out for special placement into a new legal framework, a privately-ordered contractual regime under which the phone companies were not only free to pick and choose as they saw fit, but also free to act as censors by determining which providers were involved in harmful matter. In the absence of this new contract-based framework, the companies would have been obligated to provide billing and collection services to all information providers. The new framework thus created the opportunity for the companies' private conduct. The Court is aware that the companies' *desire* to discriminate preceded the statute; the statute, however, was a prerequisite to the implementation of that desire and changed a valid business decision into impermissible state action.

By engaging in the now-permitted conduct, the private actors were and are exercising rights created by the state. Their conduct may fairly be found to involve the "exercise of some right or privilege created by the state." *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753; *Reitman,* 387 U.S. at 381, 87 S.Ct. at 1634 ("The right to discriminate is now one of the basic policies of the State.").

*IV. GTEC's motives are irrelevant.*

■ The discussion thus far has not distinguished PacBell from GTEC. A late-comer to the litigation, GTEC does not appear to have worked hand in glove with the legislature for passage of section 2884.2. Despite these factual differences, GTEC is a state actor as well.

GTEC submitted evidence showing that it had a national policy against providing any services to adult information providers well before the Legislature added section 2884.2. This evidence demonstrates that, left to its own devices, GTEC would have attempted to engage in content-based discrimination, whether or not the legislature passed a statute allowing it to. But GTEC cannot prevail merely by showing what it would have done in the absence of the statutory scheme. As the Supreme Court explained in one of the "lunch-counter sit-in" cases, "These convictions cannot stand, even assuming ... that the [restaurant] manager would have acted as he did independently of the existence of the ordinance" mandating segregation. *Peterson v. City of Greenville,* 373 U.S. 244, 248, 83 S.Ct. 1119, 1121, 10 L.Ed.2d 323 (1963). State action analysis does not turn on the "mental urges of the discriminators," *id.* at 248, 253, 83 S.Ct. at 1121, 1135, but on the extent to which the state, "in any of its manifestations has been found to have become involved" in private conduct that the Constitution prohibits the state from engaging in directly. *Burton,* 365 U.S. at 722, 81 S.Ct. at 860.

GTEC, like the Southern restaurant owners, cannot avoid a finding of state action by asserting that it would have engaged in the conduct in any event, whether or not the state mandated or encouraged it. *See Robinson v. Florida,* 378 U.S. 153, 156–57, 84 S.Ct. 1693, 1695, 12 L.Ed.2d 771 (1964); 2 R. Rotunda, *supra,* § 16.3 at 172–73.

GTEC's argument that it would have done what it did in the absence of any California authorization to do so must fail. The extensive factual squabbling over GTEC's national policy, when it was implemented, how it was implemented, etc., is irrelevant. As a legal matter, when GTEC acts, pursuant to section 2884.2, to withdraw billing and collection services from harmful matter providers, its conduct is "fairly attributable" to the state. Acting within a state-created framework, and aiming at an objective shared with the state, GTEC is a state actor, just as much as PacBell.

*V. The cases defendants rely on are distinguishable.*

Defendants rely on several cases in an apparent effort to show that a heavily regulated utility can never be a state actor, no matter what its relationship with the state. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), does not end the state action inquiry. On the facts of *Jackson,* the Supreme Court held that the requisite "close nexus" between the state and the utility company did not exist. *Id.* at 350–51, 95 S.Ct. at 453–54. In *Jackson,* the Court found that the state had not put its imprimatur on the challenged conduct, had "not put its weight on the side of the proposed practice by ordering it," and had not "either overtly or covertly" encouraged the practice. *Id.* at 357 & n. 17, 95 S.Ct. at 456–57 & n. 17; *see also San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 547, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) (no evidence of coercion or encouragement over autonomous body).

*Westpac* is a different situation. The state changed existing law, then implemented a free choice scheme that was intended to encourage the utility's conduct and make "possible First Amendment rights issues ... irrelevant." Sen.Comm. Report, SB 1844, *supra,* at 3.

Defendants' other authority is similarly inapposite. *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291, 1297 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), reversed a district court's finding of state action in a dial-a-porn case. The Court of Appeals held that the district court had erred in adopting a "public function" analysis. Censorship is not a public

function, and therefore the Arizona utility company could not have been performing a public function in attempting to censor disfavored speech. *Id.* Language in the opinion stating that the phone company was free to contract as it wished does not preclude a finding that, on the facts present here, the defendants' "free" contractual choices are actually fairly attributable to the state of California.

Another of the many *Carlin* decisions, *Carlin Communications, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1361 (11th Cir.1986), upheld the district court's grant of summary judgment in favor of the phone company because the evidence did not give rise to a reasonable inference of encouragement or coercion on the part of the state. Here by contrast, as fully explained above, there is a strong inference of state involvement and encouragement.

## CONCLUSION

The Court emphasizes that the result it reaches here does not rest on the phone companies' monopoly power, nor on some notion that the phone companies perform a traditional governmental function or an essential public service when they attempt to regulate the content of their customers' speech. *Cf. Jackson*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477; *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d at 1297.

Rather, this result rests on an application of various Supreme Court precedents holding that the relationship between a private actor and the state is so close that the conduct of the private actor must be deemed attributable to the state itself, and therefore subject to the Constitution's protections. Those cases, when applied to the facts of this case, dictate the conclusion that defendants' attempts to withhold billing and collection services are "fairly attributable" to the state. "Enough" encouragement is present. Plaintiffs have a substantial likelihood of prevailing on the merits of the state action issue, and the probability of irreparable damage exists.

For the foregoing reasons, the Court's preliminary injunction remains in effect.

*Scheduling.*

The Court hereby sets a status conference for Thursday, February 21, 1991, at 2:30 p.m. With one appeal already pending in the Ninth Circuit, and the Helms Amendment's constitutionality still unsettled, there is a strong likelihood that developments outside the control of this Court will substantially affect this case. The Court wishes to conduct further proceedings in the manner most efficient and cost-effective for all concerned. The parties are directed to submit a joint status conference statement, no more than ten pages in length, five Court-days before the hearing. The statement shall address the issue of how this litigation should now proceed.

IT IS SO ORDERED.